# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

VERONICA C. KOELZER,

          Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

          Defendant.

Case No. 3:16-cv-00087-SLG

## DECISION AND ORDER

Veronica Koelzer filed an application for Disability Insurance Benefits ("disability insurance") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"),[1] alleging disability beginning November 1, 2013.[2] Ms. Koelzer has exhausted her administrative remedies and seeks relief from this Court.[3] She argues that the determination by the Commissioner of the Social Security Administration ("Commissioner") that she is not disabled, within the meaning of the Act, is not supported by substantial evidence and that the Administrative Law Judge ("ALJ") committed legal errors.[4] Ms. Koelzer asks for a reversal of the Commissioner's decision and a remand for calculation of benefits.[5]

---

[1] The Court uses the term "disability benefits" to include both disability insurance and SSI.

[2] Administrative Record ("A.R.") 43; *see also* Docket No. 15 at 2.

[3] Docket Nos. 11 at 2; 1 at 2; A.R. 1.

[4] Docket Nos. 1; 15.

[5] Docket Nos. 1; at 2; 15 at 21.  Alternatively, Ms. Koelzer requests a remand for further proceedings with instructions.  Docket No. 15 at 21.

The Commissioner filed an answer to the complaint and an answering brief in opposition.[6]  Oral argument was not requested and was not necessary to the Court's determination.  For the reasons set forth below, Ms. Koelzer's Motion for Remand at **Docket 1** is **GRANTED**, the Commissioner's final decision is **VACATED**, and the case is **REMANDED** to the Commissioner for the immediate calculation of benefits.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it either is not supported by substantial evidence or is based upon legal error.[7] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[8]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[9]  In making its determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.[10]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[11]

---

[6] Docket Nos. 11, 17 respectively.

[7] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[8] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[9] *Id.*; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[10] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[11] *Gallant v. Heckler*, 753 F.2d 1450, 1452–53 (9th Cir. 1984).

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[12]  In addition, SSI may be available to individuals who are age 65 or older, blind or disabled, but who do not have insured status under the Act.[13]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[14]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[15]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[16]  A claimant bears the burden of proof at steps one through

---

[12] 42 U.S.C. § 423(a) (2012).

[13] 42 U.S.C. § 1381 (2012).

[14] 42 U.S.C. § 423(d)(1)(A).

[15] 42 U.S.C. § 423(d)(2)(A).

[16] 20 C.F.R. § 404.1520(a)(4) (2014).

four in order to make a *prima facie* showing of disability[17]  If a claimant establishes a *prima facie* case, the burden of proof then shifts to the agency at step five.[18]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, or (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[19]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Ms. Koelzer had not engaged in substantial gainful activity since November 1, 2013.[20]*

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities, and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.  *The ALJ determined that Ms. Koelzer has the following severe impairments: post-traumatic stress disorder ("PTSD"), dependent personality disorder, depression, history of mild traumatic brain injury, probable borderline intellectual functioning, hearing loss in the right ear, and obesity.  The ALJ found that the following impairments were not severe: GERD and bronchitis.  The ALJ also found that*

---

[17] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[18] *Treichler*, 775 F.3d at 1096 n.1.

[19] *Tackett*, 180 F.3d. at 1099.

[20] A.R. 21.

*the following alleged impairments were not medically determinable: chronic gastroenteritis, ovarian cyst, lymphedema, pelvic inflammatory disease, low back pain with pain and numbness of the left leg, left ankle pain and swelling, and arm pain.*[21]

**Step 3.** Determine whether the impairment (or combination of impairments) is the equivalent of a number of listed impairments found in 20 C.F.R. pt. 404, subpt. P, app. 1 that are so severe as to preclude substantial gainful activity. If the impairment is the equivalent of one of the listed impairments and meets the twelve-month duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step. *The ALJ determined that Ms. Koelzer does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The ALJ specifically found that the § 12.05 – Intellectual Disability criteria did not apply.*[22]

Before proceeding to step four, a claimant's **residual functional capacity** ("RFC") is assessed.[23] Once determined, the RFC is used at both step four and step five.[24] An RFC assessment is a determination of what a claimant is able to do despite his or her physical, mental, or other limitations.[25] *The ALJ concluded that Ms. Koelzer has the RFC to perform a full range of work at all exertional levels but with the following nonexertional*

---

[21] A.R. 21–23.

[22]  A.R. 23–25.

[23] 20 C.F.R. § 404.1520(a)(4).

[24] *Id.*

[25] 20 C.F.R. § 404.1545(a) (2014).

*limitations: no climbing of ladders, ropes, or scaffolds; occasional stooping; avoiding concentrated exposure to excessive noise, unprotected heights and hazardous machinery; and with work that is limited to simple, routine and repetitive tasks with only occasional direct interaction with the general public.*[26]

**Step 4.** Determine whether the impairment prevents the claimant from performing work performed in the past. At this point, the analysis considers the claimant's RFC and past relevant work. If the claimant can still do his or her past relevant work, the claimant is deemed not to be disabled. Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that Ms. Koelzer is unable to perform any past relevant work.*[27]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his or her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled. *Based on the testimony of a vocational expert ("VE"), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Koelzer can perform, including: table worker, DOT No. 730.687-182, sedentary; assembler, DOT No. 706.684-022, light; cleaner/maid hotel/motel, DOT No. 323.687-014, light.*[28]

## III.   PROCEDURAL AND FACTUAL BACKGROUND

Ms. Koelzer was born in 1984 and is currently 33 years old. She was raised in both Anchorage, Alaska and Arizona and has resided in Alaska for over a decade. Ms.

---

[26] A.R. 33.

[27] A.R. 33.

[28] A.R. 35. All jobs are listed as unskilled (SVP 2). A.R. 34.

Koelzer has learning disabilities and received special education services throughout her elementary and high school education.[29]  She graduated high school in 2005 at age 20 through the Specialized Academic Vocational Education ("SAVE") school in Anchorage.[30] From 2003 through 2005, when she was in her late teens, her performance in reading, writing, and math testing prior to graduation was consistently "far below" proficient in reading and math and "below" proficient in writing.[31]  Ms. Koelzer obtained a driver's license when she was a teenager in Arizona; she required special accommodation in order to do so.[32]

After being assaulted by a former boyfriend on December 11, 2011, Ms. Koelzer suffers from PTSD, depression, and anxiety.[33]  The assault perforated her right ear drum and caused facial bruising and mild soft-tissue injury around her neck.[34]  Ms. Koelzer's

---

[29] A.R. 439, 686; *see also* A.R. 266 (three year Individual Education Program ("IEP"), grade 11, Dec. 7, 2001), 277 (IEP, Sep. 29, 2003).

[30] *See* A.R. 298,301.  According to the Anchorage School District/s website, SAVE "is an alternative high school that specializes in working with juniors and seniors who are significantly behind in credit.  . . . Students attend SAVE for three periods, either in the morning or afternoon, after which they attend King Career Center or work at a local business.  SAVE specializes in 'meeting the student where s/he is.'"), http://www.asdk12.org/aboutschools/save/ (last visited Apr. 12, 2017).

[31] A.R. 285; *see also* A.R. 305.

[32] A.R. 55–56 ("I got my permit [] in Arizona.  They had to do the flash cards for me to—that would show like a vehicle that would say which lane would you turn because I couldn't do the computer very well . . . . [in Alaska] I took like a couple of classes for driver's ed and then I went to that [University of Alaska Anchorage]. . . .  Q. . . . like a prep course? A. Something like that.").

[33] A.R. 376–79, 661.

[34] A.R. 379.

weight has fluctuated greatly since that time.[35]  She is very afraid of being assaulted again.

Hope Community Resources employed Ms. Koelzer from 2010 through 2012 in both its Home Health Care program and at its Discovery Center.[36]  At Home Health Care, Ms. Koelzer provided individual support services (*e.g.*, bathing, feeding, and toileting) to adults.  At the Discovery Center, she provided basic monitoring of children with special needs.  Ms. Koelzer stopped working at Hope Community Resources after she accidently gave an individual the wrong medication dose.[37]  She has also worked as a cashier at a drug store, gas station, and convenience store and as a fast food employee and day care worker over the years, including while attending SAVE.[38]

Ms. Koelzer lives downstairs from her parents.[39]  A friend moved into the space with her in order to help Ms. Koelzer with her fear.[40]  Occasionally Ms. Koelzer runs errands outside her home, but only when her mother or friend accompany her; otherwise

---

[35] A.R. 543 (290 lbs., Dec. 4, 2011), 532 (200 lbs., Apr. 20, 2012), 526 (315 lbs., Aug. 1, 2012), 499 (230 lbs., Apr. 2, 2013), 423 (348 lbs., Jun. 5, 2013), 685 (364 lbs., Feb, 17, 2014).

[36] A.R. 68, 192–94, 200.  According to Hope Community Resources' website, "we are a non-profit organization providing community supports to hundreds of individuals and families who experience intellectual and developmental disabilities, traumatic brain injury and mental health challenges," https://www.hopealaska.org/about-us (last visited Mar. 29, 2017).

[37] A.R. 55, 70, 81, 440.  The A.R. indicates that Ms. Koelzer left this job voluntarily.  A.R. 440, 661.

[38] A.R. 200, 191–93, 277, 293, 321, 350.

[39] A.R. 67.

[40] A.R. 220, 227, 232.

she typically does not leave the house.[41]  Ms. Koelzer stays up through the night—out of fear that her ex-boyfriend or others will find and hurt her—and sleeps during the day.[42]

Mr. Koelzer claims disability due to a combination of impairments that includes: intellectual disability, post-traumatic stress disorder ("PTSD"), depression, anxiety, dependent personality disorder, history of a mild traumatic brain injury, hearing loss in her right ear, and obesity.[43]  Her date of last insured is December 31, 2017.[44]

The ALJ hearing was held on April 3, 2014; Ms. Koelzer was represented by counsel at that hearing.[45]  The ALJ's decision was issued on June 19, 2014, and found that Ms. Koelzer was not disabled from November 1, 2013 through the date of the decision.[46]  The Appeals Council declined to review the ALJ's disability determination on February 26, 2016.[47]  As such, the ALJ's decision is the final decision of the Social Security Administration ("SSA").[48]  Ms. Koelzer filed her complaint seeking judicial review with this Court on April 28, 2016;[49] she is represented by counsel in this appeal.

---

[41] A.R. 46, 54, 57–59, 221, 223–24, 226, 233, 235, 237.

[42] A.R. 47–48, 232, 236, 226, 440.

[43] Docket No. 15 at 2.  Ms. Koelzer asserted at the ALJ hearing that she also suffered from chronic diarrhea and gastroenteritis, GERD, pelvic inflammatory disease, ovarian cyst, peripheral edema, lymphedema, and recurrent attacks of bronchitis and respiratory infections. A.R. 45.

[44] A.R. 76.

[45] A.R. 43.

[46] A.R. 35.

[47] A.R. 1.

[48] *Brewes v. Comm'r Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

[49] Docket Nos. 1; 15.

# IV.    DISCUSSION

Ms. Koelzer argues that the ALJ erred in: (1) determining that her intellectual disability does not meet or equal the criteria in § 12.05(C) – Intellectual Disability Listing; (2) discrediting her testimony; (3) discrediting her mother's testimony; and (4) relying on the VE's testimony because the VE's opinions were based on an RFC that was not supported by substantial evidence.[50]  The Commissioner asserts that the ALJ did not err in any of these respects.

## (1) Section 12.05(C) Listing

Intellectual disability is a diagnostic category under § 12.00 – Mental Disorders that can automatically qualify a claimant as unable to pursue substantial gainful employment and therefore deemed disabled under step three of the disability analysis.[51]

Under the applicable regulation in effect at the relevant time, an Intellectual Disability under § 12.05 required the following:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of functioning is precluded;

---

[50] Docket No. 15 at 10, 16, 19, 20.

[51] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A) (2014).  The 12-month durational requirement must also be met.

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
   1. Marked restriction of activities of daily living; or
   2. Marked difficulties in maintaining social functioning; or
   3. Marked difficulties in maintaining concentration, persistence, or pace; or
   4. Repeated episodes of decompensation, each of extended duration.[52]

Unlike other diagnostic categories within § 12.00, the applicable version of § 12.05 required a claimant to satisfy "both the introductory paragraph and any one of the four sets of criteria" (*i.e.,* Paragraphs A–D).[53] Paragraph C is the subsection at issue in this case.[54]

The record includes a diagnosis of intellectual disability dated February 17, 2014 by Nan Truit, Ph.D., that on its face would appear to meet the requirements of Paragraph C.[55] However, the ALJ, after analysis, concluded that Dr. Truit's diagnosis was

---

[52] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05 (2014).

[53] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A) (2014).

[54] *Id.*

[55] A.R. 684–94

"unsupported by the evidence as a whole," and rejected it.[56]  On appeal, Ms. Koelzer argues that the ALJ improperly rejected Dr. Truit's diagnosis that Ms. Koelzer met the requirements of an Intellectual Disability diagnosis.

Dr. Truit met with Ms. Koelzer in February 2014 for a comprehensive neuropsychological evaluation.[57]  Dr. Truit interviewed Ms. Koelzer and her mother, reviewed medical records related to the assault in December 2011, and reviewed Ms. Koelzer's school records.  She also conducted a battery of assessments on Ms. Koelzer.[58]  The doctor noted a possibility of secondary gain, but explicitly found that validity of the testing had been assessed and determined to be valid.[59]

Dr.  Truit administered numerous tests to Ms. Koelzer, including the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), the Rey Complex Figure Test and Recognition Trial, the Wisconsin Card Sorting Task ("WCST"), Conners' Continuous Performance Test II ("Conners' CPT II"), the Digit Vigilance Test ("DVT"), the Posttraumatic Stress Diagnostic Scale ("PDS"), and Beck's Depression Inventory, Validity, and Pain Patient Profile ("P3").

Within the WAIS-IV, Ms. Koelzer was administered ten subtests including: verbal comprehension, perceptual reasoning, working memory, processing speed, Full Scale

---

[56] A.R.  25, 33.

[57] A.R. 685; *see* also A.R. 435, 667.

[58] A.R. 694.

[59] A.R. 687.  On this topic, the regulation states, "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and degree of functional limitations."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a).

Intelligence Quotient ("FSIQ"), and general ability. The FSIQ incorporates the ten subtest scores and Dr. Truit indicates that it "is considered the most representative estimate of global intellectual functioning."[60] Ms. Koelzer attained a composite FSIQ score of **67**.[61] Dr. Truit opined that overall, Ms. Koelzer's test results place her general cognitive ability in the "extremely low range of intellectual functioning" and "her overall thinking and reasoning abilities exceed those of only approximately 1% of individuals her age."[62]

To assess trauma and characterological development, Dr. Truit administered the PDS to evaluate for PTSD. Ms. Koelzer met all the criteria for PTSD; test results showed a severe symptom rating and level of impairment.[63]

Dr. Truit's ultimate diagnostic impressions were that "all indications are that [Ms. Koelzer] meets criteria for the DSM-5 diagnosis of intellectual disability and that this cognitive pattern is pervasive [and] has been present since at least Kindergarten." Her other diagnostic impressions included PTSD, persistent depressive disorder with anxious distress, obesity, and rapid elimination of bowel. She opined that Ms. Koelzer "generally achieved a 4th grade education" according to the school records she reviewed, the most recent of which was when Ms. Koelzer was 20 years old and receiving special education services.[64]

---

[60] A.R. 689.

[61] Dr. Truit's report indicates that she did not find any IQ scores in Ms. Koelzer's school records. However, ASD school records contain a notation that when Ms. Koelzer was 20 years old, she attained an IQ Composite score of 77 on the Kaufman Brief Intelligence Test. A.R. 301.

[62] A.R. 689.

[63] A.R. 693.

[64] A.R. 694.

Dr. Truit also opined that Ms. Koelzer was unable to work outside the home because she was "paralyzed by her symptoms of PTSD." The doctor added, "[i]t should be emphasized that Ms. Koelzer is not mentally able to seek employment at this time." She stated that Ms. Koelzer may be able to return to work—"[w]hen [Ms. Koelzer] is well enough to look for work"—with the assistance of the Division of Vocational Rehabilitation.[65]

The ALJ gave Dr. Truit's opinion that Ms. Koelzer was presently unable to work "no weight" because he did not find "her assessment to be a reasonable interpretation of [Ms. Koelzer's] true functioning."[66] Instead, the ALJ indicated he would accord "great weight" to the assessment of Wandal Winn, M.D., the State agency consultant.[67] Dr. Winn did not treat or examine Ms. Koelzer, but formulated his opinion based on his review of some—but not all—of Ms. Koelzer's medical and school records.[68] Based on that limited review, Dr. Winn diagnosed Ms. Koelzer with a non-severe hearing loss, as well as severe anxiety and personality disorders.[69] His report is silent as to any intellectual disability. His records review was done prior to Dr. Truit's evaluation; hence, he could not

---

[65] A.R. 695.

[66] A.R. 33.

[67] A.R. 32.

[68] Dr. Winn's only identifies the Paradise Valley School District records, and not the Anchorage School District records, as included within his review. *See* A.R. 78. Ms. Koelzer attended high school in Arizona in 11th grade. The records from Arizona provide only limited information regarding Ms. Koelzer's educational deficits. They do include a transition plan for Ms. Koelzer in which she would coordinate with the Department of Vocational Rehabilitation upon completion of high school. A.R. 261; *see also* A.R. 273.

[69] A.R. 80.

have been aware of it at the time of his review. He did review Dr. Campbell's report on the mental status examination he performed of Ms. Koelzer, but did not comment on the fact that Dr. Campbell notes that Ms. Koelzer exhibited cognitive defects at that examination or that Dr. Campbell opined that "[i]t would be helpful to obtain school records and psychological testing."[70]

As noted above, the ALJ explicitly rejected Dr. Truit's opinion that Ms. Koelzer met the DSM-5 criteria for intellectually disability. The ALJ stated that Dr. Truit's "diagnosis [wa]s not consistent with other evidence in the record."[71] He reasoned that no treating source had "suggested that [Ms. Koelzer] has an intellectual disability or made reference to obvious signs of below average intelligence . . . [and that] no clinical evidence of cognitive limitations" existed in Ms. Koelzer's treatment records.[72] He further noted that Dr. Truit's statement that Ms. Koelzer "had not been previously diagnosed with mild mental retardation and had no IQ scores in her academic records was not accurate." He referenced the higher IQ score of 77 noted in the school records from January 14, 2005.[73] The ALJ also maintained that neither Dr. Campbell nor Dr. Donovan had mentioned a possibility of intellectual disability, yet they had each recently evaluated or treated Ms. Koelzer.[74] The ALJ also found that Dr. Truit's statement that Ms. Koelzer was

---

[70] A.R. 442.

[71] A.R. 23.

[72] A.R. 24.

[73] A.R. 24. *See* A.R. 301 (Kaufman Brief Intelligence Test with IQ composite score of 77). In 2005, Ms. Koelzer was 20 years old.

[74] A.R. 24. The ALJ did not comment on the fact that Dr. Campbell noted cognitive deficits when he examined Ms. Koelzer, and had opined that psychological testing would be helpful.

"'currently' not functioning as expected for her age, level of education, and former functioning" did not satisfy the introductory paragraph to Listing 12.05, which requires that a claimant's "deficits in adaptive functioning initially manifested during the development period prior to age 22."[75]

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[76] Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[77] And the opinion of an examining physician "is, in turn, entitled to greater weight that the opinion of a nonexamining physician."[78] Moreover, "[a]s is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician."[79]

Here, Dr. Truit was an examining source when she conducted the neuropsychological evaluation of Ms. Koelzer and diagnosed Ms. Koelzer with an

---

The ALJ also did not comment on the fact that Dr. Donovan's records indicated that she intended to obtain such testing. See A.R. 442.

[75] A.R. 24. The ALJ did not reference Dr. Truit's statement in her report that Ms. Koelzer's diagnosis of Intellectual Disability "has been present since at least Kindergarten." A.R. 694.

[76] 20 C.F.R. §§ 404.1527(c), 416.927(c) (2014).

[77] *Garrison v. Colvin,* 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[78] *Lester*, 81 F.3d at 830.

[79] *Id.*

intellectual disability.  That opinion was not contradicted by any other doctor's opinion.  In fact, no other health care provider evaluated that specific issue.  Therefore, Ninth Circuit authority requires that the Commissioner provide clear and convincing evidence before rejecting Dr. Truit's opinion.[80]

When weighing a medical opinion, including that of an examining source, the ALJ must consider the extent to which the opinion is supported by relevant evidence, such as medical signs and laboratory results; the extent to which an opinion is consistent with other opinions and evidence in the record; whether the opinion is within the source's area of specialization; and other factors such as the medical source's degree of familiarity with the SSA's disability process and with other information in the claimant's record.[81]

Here, the Court finds that the ALJ erred in rejecting the entirety of Dr. Truit's neurological evaluation, including the extensive objective medical evidence contained within it and the doctor's professional opinions as a specialist.  As detailed above, Dr. Truit conducted a battery of tests on Ms. Koelzer.  The results of these tests are objective medical evidence that the ALJ must consider.  Among these test results is Ms. Koelzer's FSIQ score of 67.  This score falls directly within the definitional range to qualify as intellectual disability under § 12.05(C), as it is a "valid verbal, performance, or full scale IQ of 60 through 70."[82]

---

[80] *Id.* at 831 (citations omitted).

[81] *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).

[82] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C), (D).  Although a higher IQ test score is referenced in the school records, it is simply a notation in the record that a short-form IQ test had been administered to Ms. Koelzer when she was 20 years old.  No additional test results or psychologist's report is included with respect to that test.

The ALJ failed to provide any reason, much less clear and convincing reasons, for rejecting the IQ test score as determined by Dr. Truit. Indeed, on appeal, the Commissioner acknowledges that Ms. Koelzer met the valid IQ score requirement of 60 through 70 under § 12.05(C).[83]

An Intellectual Disability Listing under § 12.05(C) also requires a finding of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." On this point, Dr. Truit opined that Ms. Koelzer's PTSD constituted such a limitation. Such an opinion is amply supported not only by Dr. Truit's testing of Ms. Koelzer to confirm the severity of her PTSD, but also by many other records in the file. For example, Dr. Campbell diagnosed Ms. Koelzer with PTSD in his mental status examination,[84] and Anchorage Neighborhood Health Center records contain multiple

---

[83] Docket No. 17 at 12. The Court also observes that many of the ALJ's findings on the extent of Ms. Koelzer's cognitive deficits are inconsistent with the record. For example, the ALJ states that the mental status examiner, William Campbell, M.D. "[r]eported that the claimant had poor memory, but otherwise reported that the claimant's mental status examination results were fair to good," and he "did not include a diagnosis of intellectual disability in his report." A.R. 24. But in fact, Dr. Campbell did not address intellectual capacity at all, other than to specifically find that Ms. Koelzer "has some [cognitive] deficits on examination," and that it "would be helpful to obtain school records and psychological testing." A.R. 24. Likewise, the ALJ stated that "nothing in the treatment notes" of Cleary Donovan, PSyD, Ms. Koelzer's treating psychologist, "would suggest cognitive limitations consistent with intellectual disability." A.R. 24. But Dr. Donovan's assessment notes of March 27, 2014 state an intention to administer the Montreal Cognitive Assessment ("MoCA") "to screen for possible cognitive impairment." A.R. 660. In that regard, the time period to submit additional records to the ALJ expired on April 10, 2014. Consequently, it would be unlikely that any additional testing results could have been submitted to the ALJ by that time, if such testing was done.

[84] A.R. 442. Dr. Winn found Ms. Koelzer had a severe "anxiety disorder," consisting of "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." A.R. 80. But he then opines that Ms. Koelzer's fear of her ex-boyfriend is reasonable, "and she could address it to some significant degree by seeking work outside of Alaska." A.R. 80.

references to the diagnosis and treatment of PTSD.[85]  The records also reflect that Ms. Koelzer had received counselling at UAA "to address her reported assault in 2011."[86]  The record also contains records of the emergency treatment that Ms. Koelzer received immediately after assault.[87]  Other evidence in the record also supports the limitations of function created by Ms. Koelzer's PTSD: Ms. Koelzer rarely leaves her home and when she does she is accompanied by a family member or friend.  Ms. Koelzer stays up all night and sleeps during the day when her family is awake because she is more afraid that she will again be physically harmed when it is dark outside.  Her ability to focus and remember are also considerably impaired.

The ALJ determined that Ms. Koelzer's PTSD constitutes a severe impairment under step two of the disability analysis.  But in his step three analysis, the ALJ failed to address the PTSD at all.  Indeed, in that analysis, he does not appear to directly reject Dr. Truit's opinion that the PTSD constitutes a significant work-related limitation of function at the present time.  In his step three analysis, the ALJ failed to present virtually any evidence, let alone clear and convincing evidence in the record as a whole, which that would support his rejection of this component of the Paragraph C analysis.  Based on the foregoing, the Court finds that the ALJ erred in rejecting Dr. Truit's opinion that PTSD imposes an additional and significant work-related limitation on Ms. Koelzer's function.

---

[85] *See, e.g.*, A.R. 665, 661, 659–60.

[86] A.R. 435.

[87] A.R. 376–79.

In addition to meeting the requirements of Paragraph C, a claimant must also meet the introductory paragraph's requirement of the 12.05 Listing: The evidence must demonstrate or support onset of the impairment in intellectual functioning before age 22. On this topic, Dr. Truit opined that Ms. Koelzer's intellectual disability had been present "since at least Kindergarten."[88] The ALJ's report does not reference this important statement from Dr. Truit's report at all. Rather, the ALJ cites to another portion of the report, which states: "Dr. Truit reported that the claimant is 'currently' not functioning as expected for her age, level of education, and former functioning."[89] From this, the ALJ concludes that "[t]he evidence does not reveal deficits in adaptive functioning consistent with a diagnosis of intellectual disability."[90] Based on this statement, it appears that, at least implicitly, the ALJ reads the § 12.05(C) regulation to mean that the second requirement of Paragraph C—that there exists a physical or other mental impairment imposing an additional and significant work-related limitation of function—must also have been manifested prior to age 22.[91] The Court does not read the regulation in that manner. Rather, the introductory clause to the listing only requires that "deficits in adaptive functioning" be initially manifested during the developmental period; it does not specify when the separate and additional severe impairment set out in Paragraph C must arise.

---

[88] A.R. 694.

[89] A.R. 24, 692.

[90] A.R. 25.

[91] *Cf.* DSM-5 at page 38 ("To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [intellectual function.]). The DSM-5 definition of Intellectual Disability does not appear to contain a set of criteria similar to Paragraph C of the applicable SSA regulation.

Moreover, the regulations specifically acknowledge that a claimant's "level of functioning may vary considerably over time."[92]

Here, there are extensive school records that support Dr. Truit's opinion that Ms. Koelzer's longstanding cognitive challenges have impacted her adaptive functioning "since at least Kindergarten." Notably, in 2004, Ms. Koelzer's school achievement performance was considerably lower than her IQ result in school testing at that time.[93] As Dr. Truit notes, Ms. Koelzer "has a history of special education services beginning in Kindergarten . . . . She generally achieved a 4th grade education according to . . . test results."[94] Although she also needed special accommodations to obtain a driver's license while a teen, there have been periods when Ms. Koelzer's adaptive functioning has been higher prior to the onset of the PTSD, as demonstrated by her previous work history.[95] But the IEPs and academic performance results demonstrate that Ms. Koelzer has faced intellectual challenges from an early age.

Most importantly, Dr. Truit's opinion that Ms. Koelzer's adaptive functioning limitations arose prior to age 22 was uncontradicted. Under controlling Ninth Circuit authority, when rejecting the opinion of an uncontradicted examining physician, the Commissioner must provide 'clear and convincing' reasons."[96] Here, the ALJ stated that

---

[92] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(2) (2014).

[93] *See* A.R. 301.

[94] A.R. 694.

[95] *See, e.g.*, A.R. 293, 301.

[96] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)

"the claimant's past adaptive functioning is not consistent with a diagnosis of intellectual disability."[97]  The ALJ offered the following reasons for rejecting Dr. Truit's opinion on this topic:  First, although Ms. Koelzer had received special education services, she "is able to read," "competent to handle her own finances" and can write "in an intelligible manner."  The ALJ also observed that Ms. Koelzer's medical records did not "reveal significant limitations in her ability to communicate."  The ALJ added that Ms. Koelzer had lived independently in the past, had a driver's license, and had previously worked at substantial gainful activity.

But the ALJ's analysis misses the mark.  Ms. Koelzer had deficits and impairments in adaptive functioning due to her intellectual functioning limitations prior to age 22. Although the ALJ has identified reasons to question the severity of the adaptive functioning deficits prior to age 22, he did not adequately address or respond to the fact that such deficits existed.  The controlling regulation only required a showing that the evidence "demonstrates *or supports* onset of the impairment before age 22."[98]  In short, the Court finds that the ALJ erred in rejecting Dr. Truit's opinion that Ms. Koelzer's mental impairments meet the criteria of Listing 12.05(C).

### (2) Remaining Issues

In light of the Court's decision that the ALJ erroneously rejected Dr. Truit's neuropsychological evaluation, the Court declines to address the remaining issues raised (*i.e.*, credibility finding of Ms. Koelzer's statements pertaining to the intensity, persistence,

---

[97] A.R. 24.

[98] *See also* Revised Medical Criteria for Evaluating Mental Disorders, 75 Fed. Reg. 51,336-01, 51,339–40 (proposed Aug. 19, 2010).

and limiting effects of her impairments; according little weight to the lay opinion of Jane Koelzer; and step-five determination).

### (3) **Appropriate Remand**

A court may remand a disability benefits case to the ALJ for further administrative proceedings or for an immediate calculation of benefits. A reviewing court "retains 'flexibility' in determining the appropriate remedy."[99] A remand for further proceedings is proper when, despite legal errors, the record is uncertain and ambiguous[100] and further administrative proceedings would serve a useful purpose.[101] "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[102]

In contrast, a remand for an immediate calculation of benefits is warranted when the requirements of the "credit as true rule" are met. Those requirements are met when: (1) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; (2) the record has been fully developed and further proceedings would serve no useful purpose; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.[103]

---

[99] *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (citing *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014)).

[100] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1104 (9th Cir. 2014).

[101] *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (citing *Garrison*, 759 F.3d at 1020); *see also Burrell*, 775 F.3d at 1141.

[102] *Brown-Hunter*, 806 F.3d at 496 (citing *Treichler*, 775 F.3d at 1101).

[103] *Id.* at 494 (citing *Treichler*, 775 F.3d at 1105; *Garrison*, 759 F.3d at 1020).

Here, the Court has found that the ALJ improperly rejected the objective medical evidence within Dr. Truit's neuropsychological examination, as well as her diagnosis and uncontradicted opinions as a specialist. "[T]he SSA has recognized that '[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability,'" such that an IQ test score "can be the deciding factor in a determination of intellectual disability."[104]

The Court finds that there are no outstanding issues and that the administrative record is fully developed. Once the discredited evidence as set forth in Dr. Truit's evaluation is credited as true, the ALJ would be required to find the claimant disabled on remand. Ms. Koelzer conclusively meets the definition of criteria (C) in § 12.05—she had an FSIQ of 67, with demonstrated adaptive functioning deficits initially manifested prior to age 22, as well as severe PTSD that imposes an additional and significant work-related limitation of function. Thus, a remand for an immediate calculation of benefits is appropriate in this case.

## V.    CONCLUSION

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and his decision to deny benefits is not supported by substantial evidence. The Court finds that Ms. Koelzer satisfies the criteria for Listing 12.05 and is therefore disabled as defined under the Act. Accordingly, IT IS ORDERED THAT **Docket 1** is **GRANTED**. The Commissioner's final decision is

---

[104] *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 931 (9th Cir. 2014) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(b)).

**VACATED** and the case is **REMANDED** to the SSA for an immediate calculation of benefits.

DATED this 17th day of May, 2017 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE